UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                        Plaintiff,                              REPORT & RECOMMENDATION
                                                               and DECISION & ORDER

            v.                                                 10-CR-6172CJS

AUDREY THOMAS,

                        Defendant.
_____


**PRELIMINARY STATEMENT**

             By Order of Hon. Charles J. Siragusa, United States District Judge, dated August

31, 2010, all pretrial matters in the above-captioned case have been referred to this Court

pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 4).

             On August 31, 2010, defendant Audrey Thomas ("Thomas") was charged in a

single-count indictment with theft of government property in violation of 18 U.S.C. § 641, and a

summons was issued directing Thomas to appear in court on September 14, 2010.[1]  (Docket # 3).

Thomas appeared for arraignment as directed, at which time this Court imposed a pretrial release

condition requiring Thomas to submit to collection of a DNA sample as authorized by the DNA

Analysis Backlog Elimination Act (the "DNA Act" or the "Act"), 42 U.S.C. § 14135a.  (Docket

# 6).  At Thomas's request, the Court ordered that Thomas's counsel be notified before any

_____

             [1] The United States Attorney for the Western District of New York previously had filed a criminal
complaint charging Thomas with the same offense, although she was not arrested and did not appear in connection
with the complaint.  (Docket # 1).

collection in order to permit Thomas to challenge the statute. (*Id.*). Thomas was released on her

own recognizance and remains on release pending trial. (*Id.*).

Currently pending before this Court are motions by Thomas seeking (1) dismissal

of the one-count indictment on the grounds of duplicity; (2) a judicial determination that the

DNA Act is unconstitutional as applied to her because she has not been convicted; and (3) a bill

of particulars. (Docket # 10).

For the reasons discussed below, I recommend that the district court deny

Thomas's motions to dismiss the indictment and to declare the DNA Act unconstitutional as

applied to her. I also deny Thomas's motion for a bill of particulars.

## REPORT & RECOMMENDATION

### I. Dismissal of the Indictment for Duplicity

I turn first to Thomas's motion to dismiss the indictment on the basis that it is

duplicitous. "An indictment is invalidly duplicitous when it joins in a single count two or more

distinct and separate offenses." *United States v. Droms*, 566 F.2d 361, 363 (2d Cir. 1977);

*accord United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992). A count is duplicitous only

"'if a general verdict of guilty might actually conceal contrary findings as to different alleged

crimes, or if an appropriate basis for sentencing is not provided.'" *United States v. Parker*, 165

F. Supp. 2d 431, 447 (W.D.N.Y. 2001) (quoting *United States v. Margiotta*, 646 F.2d 729,

732-33 (2d Cir. 1981)). *See United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980) ("the

prohibition of duplicity is said to implicate a defendant's rights to notice of the charge against

him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in a subsequent prosecution").

Duplicity is a rule of pleading, however, and its violation does not warrant dismissal. *United States v. Droms*, 566 F.2d at 363 n.1 (citing *Reno v. United States*, 317 F.2d 499, 502 (5th Cir.), *cert. denied*, 375 U.S. 828 (1963); 1 C. Wright, *Federal Practice and Procedure*, § 142 at 311 (1969)). Rather, the appropriate remedy is to require the government to elect between the duplicitous charges prior to trial. *Id*. at 363; *United States v. Parker*, 165 F. Supp. 2d at 451.

In this matter, the indictment charges:

> Between on or about September 26, 2005, and on or about October 11, 2005, the exact dates being unknown, in the Western District of New York, the defendant, AUDREY THOMAS, did willfully and knowingly steal, purloin and convert to her own use money of the United States exceeding $1,000 in value, to wit, Federal Emergency Management Agency disaster assistance funds in the amount of $2,000 which were fraudulently obtained and to which the defendant was not entitled.

(Docket # 3). The language of the indictment tracks the language of the statute under which Thomas is charged, which prohibits embezzling, stealing, purloining, or knowingly converting money or a "thing of value of the United States." 18 U.S.C. § 641.

Thomas contends that the indictment charges her with three distinct crimes – stealing, purloining and conversion – each of which is defined differently under model jury instructions. (Docket # 10 at 5-6). Any guilty verdict, Thomas further maintains, "would be infected by uncertainty as to whether the verdict concealed a finding of guilt as to one but not the

other crimes" and would "raise serious concerns that the jury was not unanimous as to any one of the crimes charged." (*Id*. at 6).

In support of her argument, Thomas cites the Supreme Court's decision in *Morissette v. United States*, 342 U.S. 246, 271 (1952), which addresses the distinction between stealing and conversion and whether intent is an element of conversion under Section 641. *Morissette v. United States*, 342 U.S. at 270-73. The Court in *Morissette* did not address duplicity.

Thomas's contention that the indictment is duplicitous fails under settled authority. As the Supreme Court reaffirmed in 1991:

> A statute often makes punishable the doing of one thing *or* another, ... sometimes thus specifying a considerable number of things. Then, by proper and ordinary construction, a person who in one transaction does all, violates the statute but once, and incurs only one penalty. Yet he violates it equally by doing one of the things. Therefore the indictment on such a statute may allege, in a single count, that the defendant did as many of the forbidden things as the pleader chooses, employing the conjunction *and* where the statute has 'or,' and it will not be double, and it will be established at the trial by proof of any one of them.

*Griffin v. United States*, 502 U.S. 46, 51 (1991) (quoting 1 J. Bishop, *New Criminal Procedure*, § 436, 355-56 (2d ed. 1913) (footnotes omitted)). *See also United States v. Bilzerian*, 926 F.2d 1285, 1302 (2d Cir.), *cert. denied*, 502 U.S. 813 (1991). In other words, although a single count may not charge two separate offenses without running afoul of the duplicity doctrine, it may charge two means of committing the same offense. *See United States v. Aracri*, 968 F.2d at 1518; *United States v. Murray*, 618 F.2d at 896; *Droms*, 566 F.2d at 363; *see also* Fed. R. Crim.

P. 7(c)(1) ("[a] count may allege . . . that the defendant committed [the offense] by one or more specified means").

Several courts have addressed duplicity challenges to Section 641, and each has held that the statute is not duplicitous, but rather describes alternative methods of committing a single offense. *E.g.*, *United States v. Burton*, 871 F.2d 1566, 1574 (11th Cir. 1989) ("[t]he acts of embezzling and converting government property simply constitute two separate ways in which a violation of [Section 641] may occur, not two separate crimes"); *Parker*, 165 F. Supp. 2d at 449, 450 (the language of Section 641 "alleges, conjunctively, the alternative means by which the offense as defined in the statute may be committed" and thus is not duplicitous; "[Section] 641 does not seek to punish the embezzling, stealing, purloining or conversion as crimes *per se*, rather, it prohibits any such form of theft of government property"); *United States v. Selage*, 175 F. Supp. 439, 442 (D.S.D. 1959) (enumerated acts in Section 641 are a "mere method of means of committing the offense of depriving the government of its property"). I find no basis to reach a different result in this case.

Thomas further argues that the language of the count charges Thomas with criminal activity on two separate occasions and thus "alleges multiple separate crimes." (Docket # 10 at 7). This argument is without merit. The count charges Thomas with a single theft and conversion of $2,000 occurring "[b]etween on or about September 26, 2005, and on or about October 11, 2005, the exact dates being unknown." (Docket # 3). The single count does not allege separate crimes committed on two dates, but rather charges one crime that occurred *between* September 26 and October 11, 2005.

5

Accordingly, I recommend that the district court deny Thomas's motion to dismiss the indictment for duplicity.

## II.  Fourth Amendment Challenge to the DNA Act

In 2000, Congress enacted the DNA Act, which authorized the collection of DNA samples from individuals convicted of specified federal offenses and who were still in custody or were being supervised on those convictions.[2]  *See* 42 U.S.C. § 14135a.  In 2006, Congress amended the statute to authorize the Attorney General to collect DNA samples from individuals who are arrested or facing charges, as well as from convicted persons.[3]  42 U.S.C. § 14135a.  Specifically, the Act now provides, in relevant part:

(a) Collection of DNA samples

(1) From individuals in custody

(A) The Attorney General may, as prescribed by the Attorney General in regulation, collect DNA samples from individuals who are arrested, facing charges, or convicted or from non-United States persons who are detained under the authority of the United States.

---

[2]  The list of qualifying federal offenses was amended thereafter in 2001 and again in 2004.  *See* 42 U.S.C. § 14135a(d)(1); *United States v. Amerson*, 483 F.3d 73, 77 (2d Cir.), *cert. denied*, 552 U.S. 1042 (2007).

[3]  The Bail Reform Act was similarly modified to require a judge who releases a defendant on his or her own recognizance or on specified conditions to order the defendant to "cooperate in the collection of a DNA sample" if the collection is authorized by the DNA Act.  *See* 18 U.S.C. § 3142(b).

*Id.* The implementing regulations direct that "[a]ny agency of the United States that arrests or detains individuals or supervises individuals facing charges shall collect DNA samples" from those individuals identified in 42 U.S.C. § 14135a(a)(1)(A). 28 C.F.R. § 28.12(b).

In this district, the government uses buccal swabs to collect the required DNA samples. (Docket # 11 at 12 n.1). The samples are then analyzed and stored in the following manner:

> After a sample is collected, unique identifying information is obtained for each [donor] by decoding sequences of "junk DNA," which [are] "purposely selected because they are not associated with any known physical or medical characteristics." The DNA profiles are then loaded into CODIS [the Combined DNA Index System], a national database that also contains profiles generated by state DNA collection programs, as well as DNA samples obtained from the scenes of unsolved crimes.

*United States v. Amerson*, 483 F.3d at 76.[4]

The statute authorizes disclosure of the collected DNA profiles only:

> (a) to criminal justice agencies for law enforcement identification purposes;
>
> (b) in judicial proceedings, if otherwise admissible pursuant to applicable statutes or rules; and
>
> (c) for criminal defense purposes, to a defendant, who shall have access to samples and analyses performed in connection with the case in which such defendant is charged.

42 U.S.C. § 14133(b)(1).

---

[4] Nothing in the record before this Court suggests that the government does not follow the same procedures today as those described in the 2007 *Amerson* case.

Thomas maintains that application of the DNA statute to her as an "accused," but not convicted, person violates the Fourth Amendment's prohibition against unreasonable searches and seizures. (Docket # 10 at 10-15). Thomas emphasizes that she was never arrested on the indictment and was released on her own recognizance without pretrial supervision. (*Id*. at 13-14).

The government does not dispute that the collection of DNA samples from indicted persons implicates the Fourth Amendment. (Docket # 11 at 8). Instead, the government contends that the DNA statute is a lawful exception to the general prohibition against government searches in the absence of individualized suspicion of wrongdoing. (*Id*. at 8). Accordingly, I must assess whether collection of a DNA sample from a person charged with, but not convicted of, a felony is reasonable under the Fourth Amendment – an issue of apparent first impression in this Circuit.

### A. Legal Framework

The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. Under the Fourth Amendment, a search or seizure that is not supported by probable cause or individualized suspicion of criminal activity is generally unreasonable. *Safford Unified Sch. Dist. No. 1 v. Redding*, 129 S. Ct. 2633, 2639 (2009); *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). *See also Amerson*, 483 F.3d at 77-78. Although suspicionless searches are "highly disfavored," *Amerson*, 483 F.3d at 77, they nonetheless may be reasonable under the Fourth Amendment – an analysis that generally turns on a balancing of the government's "special need" or interest in the search against the intrusion on the individual's privacy interest. *See Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).

The overwhelming majority of courts that have addressed Fourth Amendment challenges to federal or state DNA indexing laws have found the statutes to be constitutional. *See Amerson*, 483 F.3d at 78 & n.3; *United States v. Kincade*, 379 F.3d 813, 830-31 & n.25 (9th Cir. 2004) (*en banc*) (collecting cases), *cert. denied*, 544 U.S. 24 (2005); *United States v. Mitchell*, 681 F. Supp. 2d 597, 601 (W.D. Pa. 2009) (collecting cases). They have reached those determinations employing either the "special needs" test or the "totality of the circumstances" test. *Amerson*, 483 F.3d at 78. The principal difference between the two tests is the requirement of the former that the government establish that the search is justified "by a special need beyond the ordinary need for normal law enforcement." *Id*. at n.6. *See Griffin v. Wisconsin*, 483 U.S. at 873.

By logical extension, the Second Circuit's determination in *Amerson* that the special needs test applies to a challenge by probationers to the DNA Act, 483 F.3d at 79, requires application of that test to a challenge by an indicted person. Quite simply, if the expectations of privacy possessed by probationers are not sufficiently diminished to justify application of the totality of the circumstances test, the expectations of privacy of non-convicted persons can hardly justify application of a more relaxed standard. In any event, if the statute passes muster under the special needs test – a test that the Second Circuit has characterized as "more stringent" than the totality of the circumstances test, *see Amerson*, 483 F.3d at 79 n.6 ("the special needs test, as applied in this circuit, is 'more stringent' than the general balancing test") (citing *Nicholas v. Goord*, 430 F.3d 652, 664 n.22 (2d Cir. 2005), *cert. denied*, 549 U.S. 953 (2006)) – it necessarily will pass muster under the totality of the circumstances test.

Any analysis of the constitutionality of the DNA Act as applied to Thomas must begin with the Second Circuit's decision in *Amerson*, in which the Court upheld the DNA Act's application to probationers. Although the statute's application in this case implicates a different class of persons – indicted individuals who have not and may never be convicted of any crime – the Second Circuit's determination and reasoning in *Amerson* still provides critical guidance.

Before turning to *Amerson*, I note the dearth of authority addressing challenges to the DNA Act brought by indicted, non-convicted persons. Indeed, only two federal courts – both outside this Circuit – have considered the constitutionality of DNA collection from an accused defendant. Although both cases involved defendants who had been indicted and arrested,[5] and both courts employed the totality of the circumstances test, they reached contrary conclusions. *Compare United States v. Pool*, 621 F.3d 1213 (9th Cir. 2010) *with United States v. Mitchell*, 681 F. Supp. 2d 597 (W.D. Pa. 2009). The Ninth Circuit held in *Pool*:

> If not at the time that a person is arrested, certainly once there has been a determination of probable cause to believe that an individual has committed a federal felony, the individual no longer has any "right" or legitimate expectation of keeping his or her identity from the government. In light of the government's legitimate interests in determining the true identity of the person, the balance between those rights and the individual's rights favors the government, at least where, as here, the purpose and effect of requiring DNA are only to provide the government with the person's true identity.

621 F.3d at 1223 (internal citation omitted). By contrast, the district court in *Mitchell* concluded that it could find "no compelling reason to unduly burden a legitimate expectation of privacy and extend . . . warrantless, suspicionless searches to those members of society who have not been

---

[5] The defendant in *Pool* had been released on pretrial conditions; the defendant in *Mitchell* had been detained pending trial.

convicted, are presumed innocent, but have been arrested and are awaiting proper trial."[6] 681

F. Supp. 2d at 610.

## B.  Application of the Special Needs Test

**1.  The Act Serves a Special Need:**  The first requirement of the special

needs test is that the search and seizure be justified by a special need beyond the ordinary needs

of normal law enforcement.  *Amerson*, 483 F.3d at 80 (citing *Griffin*, 483 U.S. at 873).  A

"general interest in crime control" does not qualify as a special need.  *City of Indianapolis v.

Edmond*, 531 U.S. at 41-42.  If crime control is one purpose of a programmatic search, however,

"the program may nevertheless be reasonable under the special needs doctrine so long as crime

control is not the program's primary purpose."  *Lynch v. City of New York*, 589 F.3d 94, 102 (2d

Cir. 2009), *cert. denied*, 131 S. Ct. 415 (2010) (emphasis in original).  "[T]he appropriate inquiry

. . . [is] whether the search 'serves as its immediate purpose an objective distinct from the

ordinary evidence gathering associated with crime investigation.'"  *Amerson*, 483 F.3d at 81

(quoting *Nicholas v. Goord*, 430 F.3d at 663).

According to the court in *Amerson*, the primary purpose of the DNA Act is to

create a DNA identification index to assist in solving crimes.  *Id*. at 81 (citing *Nicholas*, 430 F.3d

at 668-69) (New York's DNA statute serves same primary purpose and constitutes special need)).

This purpose "is distinct from the ordinary crime detection activities associated with normal law

enforcement concerns" because "[a]lthough the DNA samples may eventually help law

enforcement identify the perpetrator of a crime, at the time of collection, the samples in fact

_____

[6]  The Third Circuit has granted rehearing *en banc* in *Mitchell*, and oral argument is scheduled for February
23, 2011.

provide no evidence in and of themselves of criminal wrongdoing, and are not sought for the investigation of a particular crime." *Id*. (quoting *Nicholas*, 430 F.3d at 668-69). Indeed, the very programmatic nature of the testing required by the Act "provide[s] a check on the arbitrary use of government power" by depriving government agents of any discretion to determine when, whether and from whom to demand a sample. *Id*. at 82. *See United States v. Pool*, 621 F.3d at 1234 (Lucero, J., concurring) ("programmatic searches do fulfill another 'essential purpose of a warrant requirement,' namely 'to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents'") (quoting *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 621-22 (1989)). Stated another way, because the purpose of collecting DNA samples "is to obtain identifying information, not to uncover evidence of wrongdoing or solve a particular crime . . . the concept of individualized suspicion has little role to play." *Amerson*, 483 F.3d at 82 (quoting *Illinois v. Lidster*, 540 U.S. 419, 424 (2004)). Further, the Second Circuit noted that the fact that the quantitative and qualitative benefits of the DNA identification index could not be accomplished through "normal" law enforcement activity underscores the statute's aim as a special need. *Id*. Finally, the court observed that the Act also serves to prevent misidentification of suspects by excluding innocent persons from suspicion of criminal activity. For all these reasons, the court had "no trouble" determining that the DNA testing mandated by the [2004] DNA Act "qualifie[d] as a special need." *Id*. at 83.

Thomas urges me to distinguish this case from *Amerson* on the grounds that the statute as applied to her would amount to "nothing more than . . . [the] collect[ion] [of] evidence to be used to investigate and prosecute ordinary criminal wrongdoing." (Docket # 10 at 16-18).

12

The record before this Court, however, includes no evidence – in terms of legislative history, law enforcement practices concerning the use of DNA collected by non-convicted persons or otherwise – from which to conclude that the purpose of the amended Act is different from the purpose of the 2004 Act as determined in *Amerson*. Therefore, this Court is bound by precedent to conclude that the primary purpose of the DNA Act remains the creation of an identification index to assist in solving crimes. Accordingly, the search required by the DNA Act necessarily qualifies as a special need.

I turn now to the second prong of the special needs test, which requires the court to examine "whether the search was reasonable in light of that special need." *Amerson,* 483 F.3d at 80. This balancing test incorporates three factors: "(1) the nature of the privacy interest involved; (2) the character and degree of the governmental intrusion; and (3) the nature and immediacy of the government's needs, and the efficacy of its policy in addressing those needs."[7] *Id*. at 83-84. Accordingly, "the more attenuated the government's need[,] the more minimal must the invasion of privacy be to be countenanced under the Fourth Amendment." *Amerson*, 483 F.3d at 84.

## 2. Nature of Privacy Interest and Degree of Governmental Intrusion:

Although the particular issue presented by this case appears to be one of first impression in this Circuit, the Second Circuit already has addressed the nature of the privacy

---

[7] The test mirrors the "totality of the circumstances" test used by both the *Pool* and *Mitchell* courts in addressing the constitutionality of the DNA statute as applied to arrestees. *Amerson*, 483 F.3d at 79 n.6 ("the second prong of our analysis, the balancing of the government interests versus the individual's privacy interests is very similar to the balancing we would conduct under a general balancing test"). *See Pool*, 621 F.3d at 1218-19 (the totality of the circumstances test assesses "the degree to which [the search] intrudes upon an individual's privacy [against] the degree to which [the search] is needed for the promotion of legitimate governmental interests") (quoting *Samson v. California*, 547 U.S. 843, 848 (2006)); *Mitchell*, 681 F. Supp. 2d at 606 (same).

interest involved in and the degree of government intrusion implicated by the collection of DNA samples by persons under probation supervision. *Amerson*, 483 F.3d at 83-87. While any analysis of privacy interests is "highly context specific," *id*. at 87, much of the court's reasoning and conclusions in *Amerson* nonetheless apply in the context presented by this case – the collection of DNA samples by indicted, rather than convicted persons. Indeed, for the reasons explained more fully below, I believe that *Amerson's* holding and its underpinnings logically dictate the result in this case.

        *Amerson* teaches that the starting point for the balancing test is to assess the degree of the affected person's reasonable expectations of privacy. 483 F.3d at 84 ("[i]t is in th[e] context of [the degree of the] expectation of privacy that the government's intrusion on the defendant's interests must be considered"). In *Amerson*, the Second Circuit characterized probationers' expectations of privacy as "diminished - but far from extinguished." *Id*. (citing *Samson v. California*, 547 U.S. at 848-49; *United States v. Knights*, 534 U.S. 112, 119 (2001)). On the one hand, probationers "do not enjoy the absolute liberty to which every citizen is entitled," *United States v. Knights*, 534 U.S. at 119; on the other, probationers enjoy "significantly higher reasonable expectations of privacy than those currently incarcerated," *Amerson*, 483 F.3d at 84 (citing *Samson*, 547 U.S. at 850). That probationers possess diminished expectations of privacy makes the degree of intrusion posed by the collection less invasive. *Amerson*, 483 F.3d at 84, 87 ("[probationers'] associated diminished expectation of privacy make[s] th[e] physical intrusion [to collect the DNA sample] even less invasive"; "even taking the two privacy interests together [the collection and the analysis of the DNA sample] . . . , given

appellants' status as probationers, the intrusion on their privacy interests from being compelled to provide DNA samples from CODIS is quite small").

The Second Circuit has not directly addressed the reasonable expectations of privacy of non-convicted, indicted persons. Certainly, their expectations of privacy may be diminished as a result of pretrial detention or pretrial supervision conditions of release, such as, drug testing, electronic monitoring or computer monitoring software. *See Pool*, 621 F.3d at 1219 (a judicial or grand jury finding of probable cause permits the government, "through the judiciary, [to] impose conditions on an individual that it could not impose on a citizen"). Of course, some indicted defendants, like the defendant in this case, are released without supervision, although all are generally subject to processing, including fingerprinting, photographing, and disclosure of personal biographical information.

That said, this Court is aware of no authority to suggest that indicted persons' reasonable expectations of privacy – even if diminished in comparison to private citizens not facing criminal charges – are diminished to the same degree as convicted probationers. By the same token, even if their privacy expectations are deemed to be as weighty as uncharged citizens, *see Mitchell*, 681 F. Supp. 2d at 607 ("this Court will not diminish Mitchell's expectation of privacy in the Fourth Amendment's balancing equation based merely upon his status as an arrestee"), such a finding would not necessarily render the search unreasonable under the special needs test. *See MacWade v. Kelly*, 460 F.3d 260, 270 (2d Cir. 2006) ("the special needs doctrine does not require, as a threshold matter, that the subject of the search possess a reduced privacy interest[;] [i]nstead, once the government establishes a special need, the nature of the privacy interest is a factor to be weighed in the balance"). In any event, for the reasons set forth below, I

do not believe that the result of this case turns on the precise point on which an indicted person's reasonable expectations of privacy is fixed on the continuum between an uncharged citizen and a convicted probationer.

The Second Circuit has identified two different privacy interests implicated by the collection of DNA samples. *Amerson*, 483 F.3d at 84-85; *Nicholas*, 430 F.3d at 669-70. The first is the physical intrusion involved in the method of collection – here, collection by buccal swab. *Amerson*, 483 F.3d at 84 n.11. In *Amerson*, the Second Circuit easily characterized the intrusion effected by taking a blood sample as "minimal," and the intrusion effected by buccal swab as an "even lesser invasion of privacy because a cheek swab can be taken in seconds without any discomfort." *Id*. at 84 & n.11.

The second and "potentially much more serious invasion of privacy" is the "analysis and maintenance of [DNA] information" in CODIS. *Id*. at 85. According to the Second Circuit, this intrusion is "significant" considering the "vast amount of sensitive information that can be mined from a person's DNA and the very strong privacy interests that *all* individuals have in this information." *Id*. (emphasis added) (citing *United States v. Kincade*, 379 F.3d at 843 (Reinhardt, J., dissenting) (discussing concerns about the "profound social effects" of "allowing the government to collect and maintain private information about the intimate details of our lives")). Despite concerns over the value of DNA information, the court determined that the statutes's safeguards adequately "minimized" the privacy invasion occasioned by the DNA indexing. First, the court observed that the CODIS database stores only "junk DNA" sequences that are not "currently associated with any known physical or medical characteristics," but rather "establish[] only a record of the [person's] identity." *Id*. Second, the court noted that the Act

"severely limits" the purposes for which the samples can be used and imposes penalties for any misuse.[8]  *Id*.  Finally, the court emphasized that the record contained no evidence of "misuse of the DNA samples" by the government or "scientific advances concerning the information that can be mined from the DNA footprint stored on the CODIS database."  *Id*. at 87.  If it did, the court cautioned, "our analysis and ultimate conclusions might very well be different."  *Id*.

The court in *Amerson* concluded that the DNA Act's restrictions on the use of DNA samples, coupled with the current scientific limitations on the analysis of "junk DNA" sequences, restrict the privacy interest currently implicated by the DNA Act to one of identity. *Id*. at 85, 86 ("[a]s a result, at least in the current state of scientific knowledge, the DNA profile derived from the offender's blood sample establishes only a record of the offender's identity," albeit one of "greater accuracy" than fingerprinting).  Thomas has adduced no evidence following *Amerson* that the government is misusing the samples or that science has advanced to permit more sensitive information to be derived from the junk DNA sequences stored in CODIS.[9]  *See Pool*, 621 F.3d at 1221 ("[a]lthough there is some scientific evidence to suggest that the 'junk DNA' that is the focus of CODIS may contain information that is not 'junk,' this, at most, indicates that the government *might* be able to ascertain genetic traits from the 13 loci, not that it actually *could* do so . . . or that [it] has any intention of doing so") (emphasis in original).  In the

---

[8]  As the court in *Pool* noted, the Department of Justice's regulations restrict the use of the DNA samples stored in CODIS for identification purposes only.  621 F.3d at 1220 (citing 73 Fed. Reg. at 74937-38 (Dec. 10, 2008)).

[9]  As the Second Circuit noted in *Amerson*, "[s]hould the uses to which 'junk DNA' can be put be shown in the future to be significantly greater than the record before us today suggests, a reconsideration of the reasonableness balance struck would be necessary."  483 F.3d at 85 n.13.

absence of such evidence, the Second Circuit's determination that the only privacy interest implicated by the DNA Act is identity remains binding.

While the determination in *Amerson* that the privacy intrusion was "quite small" explicitly rested on the appellants' "status as probationers," 483 F.3d at 87, Thomas's status as an indicted person should not alter that conclusion, in my estimation. After all, "when a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it." *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992). *Accord Boling v. Romer*, 101 F.3d 1336, 1339-40 (10th Cir. 1996). *See also Pool*, 621 F.3d at 1220 ("it is doubtful that . . . any . . . individual having been indicted by a grand jury or having been subjected to a judicial determination of probable cause, has any right to withhold his or her true identification from the government"). Accordingly, I must conclude that the intrusion occasioned by DNA sample collection for indicted persons is also "quite small."

**3. The Government's Interest:** The Second Circuit has determined that "the government has a compelling interest in rapidly and accurately solving crimes and . . . having DNA-based records of the identity of as many people as possible . . . effectuates this interest." *Amerson*, 483 F.3d at 87. Thus, the court in *Amerson* held that the "very broad societal interest" in having the "capacity to identify or exclude individuals, quickly, accurately, and at reasonable expense" outweighed the "relatively small" invasion of a probationer's privacy. *Id*. at 89. *See Pool*, 621 F.3d at 1214-15 ("where a court has determined that there is probable cause to believe that the defendant committed a felony, the government's interest in definitively determining the defendant's identity outweighs the defendant's privacy interest in giving a DNA sample as a condition of pre-trial release in cases in which the government's use of the DNA is

limited to identification purposes and there is no indication that the government intends to use the information for any other purpose").

Having found that Thomas's status as an indicted person does not materially affect the analysis of the privacy right at stake, I am constrained to follow Second Circuit precedent and conclude on the record before this Court that the government's interest in accurate and rapid identifications outweighs her privacy interest in the collection and analysis of a DNA sample. Accordingly, I recommend that the district court find that the DNA Act as applied to Thomas is constitutional under the Fourth Amendment.

My conclusion in no way seeks to diminish the genuine and substantial issues presented by the compulsory collection and analysis by the government of DNA samples from any individual, regardless of their status in our judicial system. To echo Judge Lucero's concluding remarks in his concurring opinion in *Pool*:

> This is a vexing case. The DNA profiling system at issue promises enormous potential as an investigatory tool, but its expansion or misuse poses a very real threat to our privacy. . . . [B]ut we must draw lines as best we can . . . [and are sometimes compelled to] leav[e] for another day difficult questions.

621 F.3d at 1313.

**III.  Commerce Clause Challenge to the Act**

Thomas also challenges the DNA Act as an unconstitutional exercise of Congress' power under the Commerce Clause.[10]  Specifically, Thomas asserts that "[t]he primary purpose of the DNA collection is not economic but law enforcement.  Given that Congress lacks a 'plenary police power,' it may not legislatively require the collection of DNA from those facing charges."  (Docket # 10 at 19 (internal citation omitted)).  Thomas cites no authority, nor is this Court aware of any, invalidating this or any other DNA indexing statute under the Commerce Clause.

Only a handful of courts have considered Commerce Clause challenges to the DNA Act, and each that has done so has sustained the DNA Act as a constitutional exercise of Congress' power.  *See*, *e.g.*, *United States v. Reynard*, 473 F.3d 1008, 1021-24 (9th Cir.), *cert. denied*, 552 U.S. 1043 (2007) ("personal, identifying information" contained in DNA sample is a "thing in interstate commerce," the collection and release of which may be regulated by Congress under the Commerce Clause); *Pool*, 621 F.3d at 1228 ("[a]lthough the statute here at issue [the same version of the DNA Act challenged by Thomas] is broader than the statute before us in *Reynard*, our reasoning in *Reynard* if not binding is persuasive"); *United States v. Hardy*, 283 F. App'x 84, 86 (3d Cir. 2008) (unpublished decision) (same as *Reynard*).  *Cf. United States v. Plotts*, 347 F.3d 873, 879-80 (10th Cir. 2003) (declining to address Commerce Clause challenge because DNA Act "is a legitimate exercise of congressional power under the Necessary and Proper Clause").

---

[10]  Thomas's principal challenge to the DNA Act rests on the Fourth Amendment.  Her Commerce Clause challenge, by contrast, consists only of four sentences and one case citation – *United States v. Lopez*, 514 U.S. 549 (1995).  (Docket # 10 at ¶¶ 50-51).

As the Court in *United States v. Reynard* noted, the Supreme Court has held that "personal, identifying information contained in DMV records is a thing in interstate commerce, and that the sale or release of that information in interstate commerce is therefore a proper subject of congressional regulation." 473 F.3d at 1023 (quoting *Reno v. Condon*, 528 U.S. 141, 148 (2000)) (internal brackets, quotations and emphasis omitted). "Thus the Court made clear that Congress has the authority, under the Commerce Clause, to regulate the interstate release of personal information, even when this release does not involve a sale of the information and is thus non-economic in nature." *Id.* Like the Court in *Reynard*, I conclude that the reasoning in *Condon* compels the conclusion that Congress may regulate the collection and release of personal, identifying information contained in DNA samples. *Id.*

Although *Reynard* dealt with a Commerce Clause challenge by a convicted defendant on supervised release, rather than an indicted defendant, the status of the person from whom the sample is collected does not change the analysis. *Cf. Pool*, 621 F.3d at 1228. Accordingly, I recommend that the district court reject Thomas's contention that the DNA Act is an unconstitutional exercise of Congress' power under the Commerce Clause.

## DECISION & ORDER

Thomas also moves for a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. (Docket # 10 at 8). Specifically, Thomas contends that the same language that renders the single count duplicitous also creates confusion about the crime she is charged with committing. (*Id.*). She urges the Court to order the government to provide a bill of particulars to clarify that purported confusion.

The purpose of a bill of particulars is to enable the defendant "to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should she be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted) (*per curiam*). A bill of particulars is not to be used as a discovery device to obtain "evidentiary detail" about the government's case. *See*, *e.g.*, *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.) (citation omitted), *cert. denied*, 498 U.S. 906 (1990). In other words, a bill of particulars should be granted where the information sought is "necessary" to prepare a defense and to avoid double jeopardy, not where it is merely "useful" to the defense in ascertaining the government's proof. *See United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); *see also United States v. Love*, 859 F. Supp. 725, 738 (S.D.N.Y.), *aff'd sub nom. United States v. Roberts*, 41 F.3d 1501 (2d Cir. 1994). Where the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the charged conduct is more narrow. *See*, *e.g.*, *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998) ("a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge"); *United States v. Davidoff*, 845 F.2d 1151, 1154-55 (2d Cir. 1988) (district court abused discretion in denying a bill of particulars identifying victims in seven-year racketeering conspiracy; court noted that principles governing bills of particulars "must be applied with some care when the [g]overnment charges criminal offenses under statutes as broad as RICO").

To warrant a bill of particulars, the indictment's charges against a defendant must be so general that they fail to advise her of the specific acts of which she is accused. *See United*

*States v. Torres*, 901 F.2d at 234; *United States v. Henry*, 861 F. Supp. at 1198.  In determining

that question, the court may consider whether the information sought by the defendant has been

made available through in other means, such as discovery or prior court proceedings.  *See United*

*States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984); *United States v. Kelly*, 91 F. Supp. 2d 580,

583-84 (S.D.N.Y. 2000); *United States v. Ahmad*, 992 F. Supp. 682, 684 (S.D.N.Y. 1998);

*United States v. Feola*, 651 F. Supp. 1068, 1133 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir.),

*cert. denied*, 493 U.S. 834 (1989).

   In this case, Thomas has been provided with the indictment and voluntary

discovery, which the government asserts adequately advises her of the charges against her and

the nature of the government's case.  (Docket # 11 at 7).  I agree.  The government represents

that the discovery includes documents relating to the defendant's application for Federal

Emergency Management Agency disaster assistance funds and the resulting $2,000 government

check that the defendant cashed.  Nothing in the record suggests that either the charge or the

government's evidence in support thereof is complex or confusing.  On this record, I find that

Thomas has sufficient information to prepare her defense and to avoid unfair surprise at trial, as

well as to interpose a claim of double jeopardy, if necessary.  *See United States v. Bortnovsky*,

820 F.2d at 574.  Accordingly, Thomas's motion for a bill of particulars is denied.


### CONCLUSION

   For the foregoing reasons, I recommend that the district court deny Thomas's

motions to dismiss the indictment for duplicity and to declare the DNA Act unconstitutional as

applied to her (Docket # 10).[11]  Further, Thomas's motion for a bill of particulars **(Docket # 10)**

is **DENIED**.

**IT IS SO ORDERED.**


                                                  _s/Marian W. Payson_
                                                  MARIAN W. PAYSON
                                                  United States Magistrate Judge


Dated: Rochester, New York
       February __14__, 2011

---

[11]  The government may not collect a DNA sample from Thomas unless and until the district court determines that the Act is constitutional as applied to her.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[12]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

<u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u> *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." <u>**Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**</u>

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**


  *s/Marian W. Payson*
  _____
       MARIAN W. PAYSON
   United States Magistrate Judge


Dated: Rochester, New York
       February  14 , 2011

---

[12]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed.  *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).